OPINION OF THE COURT
Charles E. Ramos, J.
“There are more fools than knaves in the world, else the knaves would not have enough to live upon” Samuel Butler 1835-1902.
The plaintiffs seek summary judgment on their claim that the defendant owes $6,750 plus attorney’s fees pursuant to a “pass-through” provision contained in a commercial lease in which the plaintiffs are the landlord and the defendant is the tenant.
The lease between the parties is a store lease, the business conducted by the defendant being fairly described by its name. The building in which the defendant’s store is located is owned by a residential co-operative corporation. The plaintiffs hold the proprietary lease for the commercial space and are shareholders of the corporation. The defendant is a tenant only, with no proprietary interest in the co-operative.
Commercial leases usually provide for rent escalations and pass-throughs of the landlord’s increased costs, including taxes, maintenance and the like.
*65 However, this case is clearly distinguishable from the ordinary situation because what is sought to be “passed through” is an assessment to liquidate the principal balance of the mortgage encumbering the property, that is, the mortgage obligation of the co-operative.
In effect the plaintiffs seek to have their proportionate share of the mortgage satisfied by their rental tenants, notwithstanding the fact that these tenants have no proprietary interest in the property. To make matters worse, the assessment is “one shot”, i.e., the full assessment must be paid in one year, regardless of how many years remain on the defendant’s leasehold. Clearly, the groundwork is in place for the defendant’s claim of inequity. The defendant asserts, and correctly so, that such an assessment is not a normal expense item, the plaintiffs are merely repaying a loan.
The plaintiffs assert that fairness is not in issue and seek the amount of the assessment and counsel fees.
The defendant argues that the plaintiffs’ interpretation of paragraph 46 of the lease is unconscionable. This view is misplaced. Paragraph 46 provides: “If the total rent payable under the proprietary lease of the sub-landlord herein as finally determined to be payable by the landlord to Lexington-79th Corporation for each of the calendar years 1980 through 1986 (or any portion of such years falling within the term of this lease), which rental for the purpose of this clause shall be deemed to include but not be limited to any special assessment or contribution to capital, is increased above the current rate of $30.40 per share per annum on the shares owned by the landlord, tenant agrees promptly to pay to landlord as additional rent in advance, on the first day of each month in each year 20% of each and every such increase in equal monthly installments. In the event that the total number of shares owned by the landlord is changed in any manner, the premises herein shall be deemed to be subject to 200 shares for the purpose of this escalation clause, and tenant shall pay the entire increase applied to the 200 shares. Special assessments and contribution to capital to be paid as billed”. The issue is not one of interpretation, for the lease provision is clear. The issue is enforceability.
*66 The defendant agreed to pay Vs of all assessments and capital contributions that plaintiffs were required to pay to the co-operative corporation (plaintiffs’ landlord). Reference is made to these potential charges at two places in the lease and the assessment at issue is the type of assessment contemplated and described in paragraph 46 — it is a contribution to capital.
There is no claim of fraud in the inducement and both parties were presumably able to read and to understand the lease.
The defendant also alleges that the shortage of available commercial space in the City of New York requires a “scrupulously” high degree of fair dealing, and that the doctrine of unconscionability should apply. The defendant further contends, that the plaintiffs “had no right under the rules of equity and good conscience to take selfish advantage of the defendant. Hard bargaining was an impossible ingredient between plaintiffs and the defendant.” The defense is that market conditions encompassing high demand and very limited supply renders this lease a contract of adhesion.
However, living as we do in a society with economic as well as personal freedoms, the courts are normally most reluctant to set aside contracts or to modify their terms. It is basic to our system of Government that the impairment of contract is a violation of the Constitution. (Dartmouth Coll. v Woodward, 4 Wheat [17 US] 518.) This court must therefore approach any assertion that a contract is unenforceable with great caution.
In order to prevail in this case, the defendant must establish that it had no freedom of choice and that it was compelled to locate its store at the premises (79th Street and Lexington Avenue, in Manhattan). The location in question is chic and highly desirable and the court does not doubt that the plaintiffs were in a “seller’s market” at the time the lease was entered into and that the terms were as the plaintiffs desired.
However, the defendant has not established, as it must, that there is an issue to be tried. There has been no showing that the defendant had no freedom of choice to *67 locate elsewhere. The conclusory statement to the effect that commercial space is scarce does not satisfy the defendant’s burden of raising triable issues of fact.
Parenthetically, it should be noted that the defendant is guilty of compounding the very situation that it alleges puts it in such a disadvantageous bargaining position. By insisting on locating its business at 79th Street and Lexington Avenue it is fanning the flames of over-demand for the type of commercial space it desires.
The defendant apparently shares the view held by altogether too many New Yorkers that only certain carefully defined neighborhoods within Manhattan are fit to live and work in. The process is self-perpetuating and has not only denied vast areas of this city from fulfilling their potential as residential and commercial centers, but it has also grossly inflated the cost of residential and commercial space within these carefully defined areas.
Leases of the type complained of here would cease to exist if businesses like the defendant would enlarge their concept of an acceptable neighborhood. The very act of locating in other parts of this city would greatly benefit not only businesses such as the defendant’s by enlarging their potential market and lowering the pressure on the cost of space, but also the city generally. The commercial and residential rediscovery of Manhattan north of 96th Street is long overdue. This court will not modify a contract to extricate the defendant from its own folly.
The defendant is a victim of fashion, not of an unconscionable contract. Accordingly, summary judgment is granted in favor of the plaintiffs and the counterclaim is dismissed.